36200.  LIBERTY MUTUAL INSURANCE COMPANY *et al.*
*v.* ALEXANDER.

DECIDED JULY 6, 1956.

*Edwin N. Ross, Marshall, Greene & Neely, Burt De Rieux,* for plaintiff in error.

*Fariss & Fariss,* contra.

FELTON, C. J.  The claimant testified that at about 7 or 8 a.m. on May 19, 1955, and while in the course of his employment he was pulling a rug from a Latex machine when his foot slipped and he almost fell to one knee and he felt a pain in his side. At about 4 p.m. of the same day, he went to Dr. Shepard for a physical examination.  That examination revealed that the claimant was suffering from an enlarged inguinal condition which had not quite progressed to the hernia stage but which had to be repaired by surgery.  Dr. Shepard testified in part as follows: "Q.  Doctor, in the course of your practice, have you had an occasion to treat or examine Mr. Otis Alexander on or somewhere near the month of May in 1955?  A.  Yes, I certainly have.  Q. Did you see him on or about May 19, 1955?  A.  I saw him May

19, 1955. Q. What complaint did he voice at that time, sir? A. Otis came in and of course it is my usual routine, I make one of these little cards. Q. History cards? A. One of these little history cards on him when Otis came in. I asked him what was giving him his trouble and he said he was turned down on a good Government job 5/18/55. Q. Would that be the day before? A. That is the day before. It states on here, sugar in urine, high blood pressure, and a hernia on the right. Q. And for what purpose was it that he came to you, Doctor Shepard? A. Strictly and purely to check on those conditions. Q. And to see if they told him the truth at the Government examination? A. To see if they told him the truth I imagine, and then very insistent on getting the rupture repaired if he had a rupture there. Q. Did you examine him, Doctor? A. Yes. Q. What did you find, Doctor? A. I found his blood pressure to be 140/100 which is definitely not a high blood pressure. I found no albumen and no sugar. And he had an open right inguinal ring, on the right; open right inguinal ring. Q. Do you consider that a hernia? A. I definitely wouldn't consider it a hernia. Q. But something that ought to be repaired? Yes. At least the boy is subject to a hernia. It's about like getting out here at dusk and trying to tell when daylight stops and dark begins. Q. As far as a layman, you classify that as a hernia? A. Well, when the ring is open, the bowel is apt to get pinched off down in there and have a rupture. It is a surgical condition that should be repaired, but it was not a hernia at that particular time. It wasn't a hernia, the bowel had not started through the canal when I saw him. Otis wanted me to have something done about it and I called Doctor Young in Chattanooga and made arrangements to let Doctor Young check him and see what he thought about it, about getting that hernia repaired, to close that ring. . . Q. Did he tell you anything, Doctor Shepard, about straining himself or hurting himself on the job anywhere? A. No. This is the only statement he made (referring to history card). The only thing he told me is just exactly the words I wrote down here, just what he was saying that he was turned down on a good Government job 5/18/55, stating that he had sugar in his urine, high blood pressure and a hernia on the right. That is the only statement he made to me about his hernia. . . Q. Doctor Shepard, did you ask

Mr. Alexander anything about the cause of the rupture? A. No, I didn't ask him any questions. Q. Ordinarily, when a patient comes to a doctor, the patient answers the doctor's questions doesn't he? A. Yes. Q. And it would be unusual for a patient to outline any features of the history of any ailment unless he was asked by the doctor wouldn't it? A. Unless he was particularly worried like this boy here was. He was told he had high blood pressure. He was told he had sugar in his urine which means diabetes. Third, he had a hernia, and he was turned down for a job because of these. All three are enough to frighten a person to seek medical investigation from someone he knew. Q. He wouldn't go any further in any historical statement than he was asked about ordinarily? A. I asked him his chief complaint and that was his statement. I didn't ask him any other questions, how long he had or when he got it. That is the only thing he said, he didn't mention anything else."

The claimant admitted that he did not work on May 18, 1955, but denied having made any statements concerning a finding made by a Government doctor in an examination on May 18, denied that he had an examination on that date and denied having any knowledge of his having a hernia condition prior to May 19, 1955.

The director had before him two diverse and irreconcilable versions of the happening. One, that of the claimant that his injury arose out of and in the course of his employment; and, two, that of the doctor that the claimant admitted his condition existed prior to May 19 and that his visit to the witness was to confirm or disaffirm a finding that he had a hernia made by a doctor on May 18 during a physical examination made in connection with the claimant's application for a Government job. As trior of the facts, the director was authorized to believe the doctor's testimony and disbelieve the claimant's and to make an award accordingly.

Since the evidence authorized the award, the court erred in reversing the award of the full board.

*Judgment reversed. Quillian and Nichols, JJ., concur.*